# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT BORRELLI AND MARGARET BORRELLI,<br><br>_____Plaintiffs,_<br><br>vs.<br><br>THE CITY OF NEW YORK, POLICE OFFICER BRENDAN CRONIN, SGT. EDWIN CHING, POLICE OFFICER RYAN BRACCONERI, POLICE OFFICER WILLIAM CONCANNON, POLICE OFFICER JEFFREY GRIFFIN, LT. KEVIN BROWN, SGT. JOSEPH SIMONETTI, and AHCI, CORP., a/k/a or d/b/a ALEHOUSE,<br><br>_____Defendants._ | Civil Action No.  15-CV-5841<br><br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

By and through their attorneys, Randolph M. McLaughlin, Debra S. Cohen, Howard B. Stolzenberg, and Terrence J. Cortelli, Plaintiffs Robert Borrelli and Margaret Borrelli ("Plaintiffs") allege upon knowledge, information, and/or belief as follows:

## PRELIMINARY STATEMENT

1.      This is a civil rights action in which Plaintiffs seek relief for Defendants' violations of Plaintiffs' rights, privileges, and immunities secured by 42 U.S.C. §1983, the Fourth and Fourteenth Amendment of the United States Constitution, and the Constitution and laws of the State of New York.

2.      It is alleged that the Defendants, acting jointly and severally, committed a series of unlawful acts that culminated in New York City Police Officer Brendan Cronin ("Officer Cronin") shooting at, and nearly killing, Plaintiff Robert Borrelli ("Rob") and his friend Joseph Felice ("Mr. Felice" or "Joe").

3.    The attack by Officer Cronin was totally unprovoked and directed at two innocent civilians simply returning home to their families after playing hockey.

4.    The acts alleged herein have had a profound, harmful, and lasting impact on the Plaintiffs, both individually and as a couple.

5.    It is alleged that Officer Cronin's violent acts occurred because the Defendant City of New York's ("City") and its police department, the NYPD, failed to adopt adequate policies, procedures, and training to address a longstanding problem of substance abuse, including alcohol, by its police officers, while both on-duty and off-duty and this deliberate indifference was a proximate cause of Plaintiffs' injuries.

6.    The City's and NYPD's deliberate indifference to adequately respond to alcohol abuse by its police officers includes a failure to adopt and enforce policies, procedures and practices addressing the use and misuse of service weapons by officers who are not fit for duty because of their consumption of alcohol while in possession of their firearms.

7.    It is further alleged that the Defendant AHCI, Corporation a/k/a or d/b/a Alehouse ("Alehouse") violated the New York Dram Shop Act, N.Y. General Obligations Law §11-101, and The Alcoholic Beverage Control Law §65(2), by serving, unlawfully selling, and assisting in procuring liquor to Officer Cronin, Sergeant Edwin Ching ("Sgt. Ching"), Police Officer Ryan Bracconeri, Police Officer William Concannon, and Police Officer Jeffrey Griffin ("Officers Bracconeri, Concannon and Griffin"), thereby causing and/or contributing to Officer Cronin's extreme intoxication and thus a proximate cause of the resulting harms inflicted upon the Plaintiffs.

8.    Sgt. Ching, Officer Cronin's supervisor, directly participated in and facilitated the abusive consumption of alcohol by Cronin on the date of the incident, both during and after

undergoing rigorous and stressful training exercises in dynamic vehicle takedowns at the NYPD training facility at Rodman's Neck.

9.      Defendants Brown and Simonetti knew, or should have known, that Officer Cronin, Sgt. Ching, and Officers Concannon, Griffin and Bracconeri consumed alcohol on their lunch break while on-duty, and in the midst of undergoing stressful and mentally-challenging training exercises under said Defendants supervision at the NYPD's Rodman's Neck training facility.

10.     Said Defendants released Officer Cronin, Sgt. Ching, and Officers Concannon, Griffin and Bracconeri from the training facility knowing they had consumed alcohol earlier in the day and without adequately determining if they were physically or mentally fit for duty, to drive a car or resume control of their service weapons.

11.     Sgt. Ching, and Officers Bracconeri, Concannon and Griffin, directly participated in and facilitated Officer Cronin's abusive consumption of alcohol while and after undergoing training exercises in dynamic vehicle take downs at Rodman's Neck on April 29, 2014.

12.     Sgt. Cronin, while Officer Cronin's supervisor, directly participated in, encouraged and facilitated Officer Cronin's abusive consumption of alcohol and by his actions and inactions communicated to Cronin he could consume alcohol, drive his car and be in possession of his service weapon without consequences.

13.     Lt. Brown and Sgt. Simonetti facilitated and encouraged Officer Cronin's abusive consumption of alcohol and by their actions and inactions communicated to Cronin he could consume alcohol, drive his car and be in possession of his service weapon without consequences.

14.     Sgt. Ching and Office Bracconeri took no actions to prevent Cronin from driving his vehicle while intoxicated while in possession of his service weapon while Cronin was known,

or should have been known, to be unfit to do so. Said Defendants actions and inactions communicated to Cronin he could violate the law and NYPD policies without consequences.

15.     As a remedy for the violations alleged therein, Plaintiffs seek compensatory damages; punitive damages; an award of the costs and expenses of this action including attorneys' fees to the Plaintiff pursuant to 43 U.S.C. §1988; and any such other and further relief as this Court may deem appropriate.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and §1343. Plaintiffs further invoke the supplemental jurisdiction of this Court under 28 U.S.C. §1367 to hear and decide claims arising under state law.

17.     Venue in the Southern District of New York is proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to this action occurred within the district.

## TRIAL BY JURY

18.     Plaintiffs demand trial by jury on each and every one of their claims herein.

## PARTIES

19.     At all times relevant, Plaintiffs Robert Borrelli and Margaret Borrelli were and are residents of Westchester County, New York.

20.     Defendant, the City of New York ("City") is a duly constituted municipal corporation of the State of New York. It is authorized under the laws of the State of New York to maintain a police department, the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City

assumes the risks incidental to the maintenance of a police force and the employment of police officers.

21.     Defendant Officer Cronin was at all times relevant herein a police officer employed by the City and NYPD and a resident of Westchester County.  At all times relevant to the facts of the complaint, said Defendant was acting under color of law and within the scope of his employment by the City. Said Defendant is sued in his individual and official capacity.

22.     Defendant Sgt. Edwin Ching ("Sgt. Ching"), was at all times relevant herein an employee of NYPD. At all times relevant to the facts of the Complaint, said Defendant was acting under color of law and within the scope of his employment by the City. Said Defendant is sued in his individual and official capacity.

23.     Officers Bracconeri, Concannon and Griffin were police officers who were undergoing training with Officer Cronin and consumed alcohol with him and Sgt. Ching. Said Defendants are sued in their individual and official capacity.

24.     Defendants Lt. Brown and Sgt. Simonetti were supervisors of the training received by Officer Cronin on April 29, 2014 and both Defendants observed and interacted with him during and upon completion of the training.

25.     Defendant AHCI, Corp., a/k/a or d/b/a Alehouse, was at all times relevant herein a New York State corporation operating a restaurant and/or bar establishment with an active liquor license at 288 City Island, Bronx, NY 10464.

26.     The conduct and injuries complained of herein were inflicted by the Defendants without any negligence or culpable conduct on the part of Plaintiffs.

## FACTUAL ALLEGATIONS

27.     The incident complained of herein occurred on the evening of April 29, 2014 when Plaintiff, Rob, and his good friend, Joe, were driving home after playing in a hockey game as part of a recreational league they had participated in together for many years.

28.     When the game was over, the two men got into Rob's car to drive home.

29.     Rob exited the Hutchison River Parkway at the Lincoln Ave exit in Pelham, NY, heading towards Joe's New Rochelle home.

30.     The two men were engaged in conversation as Rob brought his car to a stop at a yellow traffic light at the corner of Lincoln and 6th Ave.

31.     As the two men waited for the light to change, Defendant Officer Cronin stepped out of the shadows, walked purposefully to the driver's side rear door of his parked car, opened the door, reached inside, retrieved his service weapon and, in a bladed stance, fired repeatedly into Rob's car, emptying his clip.

### Cronin's Actions Leading Up To The Shooting

32.     Earlier, Officer Cronin spent his shift completing the second day of training in high risk traffic stops at the NYPD's Rodman's Neck training facility.

33.     Defendants Lt. Brown and Sgt. Simonetti supervised the training and directly observed and interacted with Officer Cronin during and after completion of the training.

34.     During the training and while on-duty, Officer Cronin, along with his supervisor, Sgt. Ching, and Officers Bracconeri, Concannon and Griffin, went to nearby City Island to eat lunch. All of them consumed alcohol during lunch and before returning to continue their training under the supervision of Lt. Brown and Sgt. Simonetti.

35.     Later in the afternoon, Officer Cronin and his colleagues were released from

training by Lt. Brown and Sgt. Simonetti.

36.     Upon departing the training facility, Officer Cronin, Sgt. Ching, and Officer Bracconeri returned to City Island to the Alehouse to watch a hockey game and consume, by Officer Cronin's own admission, at least ten drinks consisting of Jameson whiskey shots and beer. Sgt. Ching and Officer Bracconeri participated in, and encouraged, Cronin's heavy drinking that night.

37.     Sgt. Ching and Officer Bracconeri bid Officer Cronin farewell as they left Alehouse knowing that he was getting into his vehicle, ostensibly to drive home to Yonkers, while intoxicated and in possession of his NYPD issued service weapon.

38.     Instead of driving directly home, Officer Cronin exited the highway and stopped his car, with hazard lights flashing, in the parking lane of E. Lincoln Avenue in Pelham, New York.

39.     A security video from a car wash across the street from where Officer Cronin parked then shows Cronin getting out of his car and walking into an adjacent yard.

40.     The video also captured the chilling events that followed that have changed the lives of Plaintiffs forever.

**The Shooting**

41.     When Rob stopped his car at the yellow light, Officer Cronin can be seen on the car wash video stepping out of the shadows, walking purposefully to the driver's side rear door of his stopped car, opening the door, reaching inside, retrieving his service weapon, and in a bladed stance taught to him by the NYPD firing repeatedly and emptying his ammunition clip into Rob's car.

42.     Investigators determined that Officer Cronin, still wearing his NYPD t-shirt

stained with powder from the training exercise he underwent earlier that day at Rodman's Neck facility, fired 9 mm Glock -- his NYPD-issued service weapon -- at close range and directly at the two innocent and unsuspecting men as they sat chatting in Rob's stopped car.

43.   When Officer Cronin began firing, Joe screamed out in pain as bullets ripped through his body.

44.   The bullets moved purposefully from right to left, first striking Joe who was sitting in the right passenger seat, and then moving methodically to the left toward the driver's side where Rob attempted to crouch under the dashboard to shield himself from the onslaught of bullets riddling his car.

45.   Rob could not comprehend why the bullets were being fired, but he knew they were coming from the direction of the rear passenger side of the car.

46.   Images of Rob's car shown in news accounts memorialize the fusillade of bullets let loose by Cronin.

47.   Rob's insurance company later declared the car as "totaled" because the damage from the attack was so extensive.

48.   Cronin emptied his clip into the inside of the car occupied by Rob and Joe. Six of those bullets hit Joe, not including a bullet fragment that lodged in his head.

49.   Rob could hear Joe screaming as bullets repeatedly struck his friend. The screams continued while Rob was helpless to move as a barrage of bullets struck the dashboard and windshield just above his head.

**After the Shooting Stops**

50.   As soon as the shooting stopped, Rob got out of his crouched position, turned to Joe and asked if he was okay. His friend responded, "I'm shot, get me to the hospital."

51.     Rob reacted immediately, speeding off, fearful that the shooting would soon begin again or that the shooter would follow them.

52.     In those first few seconds after the shooting stopped, Rob knew he had to act fast because his friend Joe was alternating between consciousness and unresponsiveness, and was clearly gravely injured.

53.     Rob realized that Montefiore Medical Center in New Rochelle was somewhere nearby.

54.     As he made his way towards the hospital, Rob heard bubbling and gurgling sounds coming from Joe, his friend of almost twenty years, who had become completely unresponsive to Rob's attempts to communicate with him.

55.     Once at the hospital, hospital workers and police officers who happened to be there at the time, helped remove Joe from the car.

56.     Rob heard Joe screaming in pain as he was being extricated from the car and he momentarily felt relief because Joe's screams meant that, at least at that moment, he was still alive.

57.     After Joe was taken inside the hospital, Rob went back to the car to retrieve Joe's phone and wallet. It was then he saw for the first time the pool of his friend's blood covering the floor mat on the front passenger side.

58.     As emergency room doctors started working to save Joe's life, Rob called his wife, Margaret; Joe's wife, Patricia; and Joe's brother.

59.     Once Joe was taken back to a trauma room, Rob did not see or know his friend's condition until the next morning because he spent the next several hours with New Rochelle Police and Pelham Police, being questioned by detectives.

60.    After being interrogated in New Rochelle, police officers drove Rob to the scene of the crime and to the Pelham police department.

61.    It was there that Rob learned that someone had been apprehended in connection with the shooting.

### Officer Cronin's Actions Immediately After the Shooting

62.    The car wash surveillance tape shows that after the shooting, Officer Cronin appeared unsure about what he wanted to do next. After standing in the street for a few seconds, seemingly watching Rob's car drive away, Cronin got into his car and slowly drove away with his hazard lights still flashing.

63.    Neighborhood residents, having heard what they believed to be shots being fired, had called the police. Within minutes of Officer Cronin driving away, the video shows a police car passing the shooting location. The police car catches up to Officer Cronin's vehicle as it enters New Rochelle, about a quarter of a mile from the shooting.

64.    As other police cars arrive, initially Officer Cronin brandished his NYPD issued 9-mm Glock out the car window and ignored repeated orders from local police to drop the weapon. It was only after he was told that he would be shot if he didn't drop the gun that Officer Cronin dropped the weapon out the car window, gave himself up and was taken into custody.

65.    Once in custody, Officer Cronin refused to take a breathalyzer test. Although his refusal was telling, no test was necessary to discern the strong alcohol odor that he emanated.

66.    While in custody that night, Officer Cronin denied any recollection of being in Pelham or of the shooting.

67.    Shortly after Officer Cronin was taken into custody by local police in Pelham, Cronin's representatives from the NYPD PBA arrived and met with him in his jail cell.

68.     Several NYPD police personnel, including high ranking officials, came to both Pelham and New Rochelle to gather information from local authorities as to what had occurred.

69.     Within a few hours of the shooting, NYPD investigators began retracing Officer Cronin's steps prior to the shooting, including determining where he had been drinking after leaving Rodman's Neck.

70.     They then visited the Alehouse to question staff regarding what they remembered about the actions of Officer Cronin and his fellow officers.

71.     Oddly, later, Alehouse staffers falsely denied that Cronin and other officers had been drinking there that night.

72.     When Cronin was initially arrested he was charged with assault. Later, a grand jury issued indictments against him for two (2) counts of attempted murder in the 2nd degree (NEW YORK PENAL LAW §§ 110, 125), two (2) counts of assault in the 1st degree (NEW YORK PENAL LAW §120.10(1), and one (1) count of operating a motor vehicle while intoxicated (NEW YORK VEH. & TRAF. § 1192(3)).

73.     Following his arrest Officer Cronin and/or his attorney have made statements to the effect that at the time of the shooting Cronin was "black-out" drunk and he was re-enacting the training he had received at Rodman's Neck on April 28 and 29, 2014.

74.     Officer Brendan Cronin pled guilty to two counts of attempted murder in the second degree, two counts of assault in the first degree, and one count of driving while intoxicated as a misdemeanor and received a nine year prison sentence.

75.     Sgt. Ching, and Officers Griffin, Concannon and Bracconeri were all the subject of Internal Affairs investigations of their actions on April 29, 2014 and all were disciplined for some, but not all of their violations of NYPD policies.

**The City's Longstanding Deliberate Indifference to Substance Abuse, Including Alcohol, By Its Police Officers**

76.     The City of New York and the NYPD are responsible for this tragic incident. Although Brendan Cronin pulled the trigger, longstanding policies, procedures and practices of the City and the NYPD proximately caused the injuries to Rob and Margaret.

77.     For decades there has been a failure to adequately address the longstanding problem of alcohol abuse by police officers, both on-duty and off-duty.

78.     There has been a failure to enact and enforce policies addressing the use, and misuse, of service weapons by police officers who are not fit for duty.

79.     The City and NYPD knew, or should have known, that there have been serious deficiencies in the operation of the NYPD training facility including, but not limited to, allowing officers undergoing training to consume alcohol while on-duty, then failing to evaluate the physical and mental state of officers after they completed often stressful, potentially high risk training exercises before returning their service weapons to them and allowing them to depart the facility and continue to abuse alcohol.

80.     Upon information and belief, some of these deficiencies began to be addressed in the aftermath of this incident with an overhaul of the training facility, beginning with the reassignment of supervisory personnel and the discipline and reassignment of Sgt. Ching. But any such changes were clearly too late to prevent the injuries to Robert and Margaret.

**The NYPD's Alcohol Culture & Off-duty Misuse of Force Incidents**

81.     It is chilling that, upon information and belief, it has been a common practice for police officers training at Rodman's Neck to drink alcohol during their lunch breaks while on-duty, return to training, and then be released from training to continue drinking at nearby City Island bars, sometimes while still officially on-duty.

12

82.     This means that the NYPD personnel responsible for training police officers at Rodman's Neck have either failed to detect that police officers have consumed alcohol while in the midst of training exercises or have turned a blind eye to this behavior, which is clearly prohibited by NYPD regulations.

83.     Not only have Rodman's Neck training personnel been deliberately indifferent to alcohol consumption by police officers while they are on-duty and undergoing training, they have returned these police officers' service weapons to them upon dismissal from training with the knowledge that these officers, including Officer Cronin, were, and/or will be, consuming more alcohol.

84.     This incident of a drunken New York City police officer shooting at innocent civilians highlights an open secret within the police force – the NYPD has a longstanding alcohol problem, and the City has been deliberately indifferent to effectively addressing it.

85.     The fact that Officer Cronin and his supervising sergeant were drinking together at lunch, while on-duty and participating in a training exercise, demonstrates the pervasive failure of the NYPD to deal with the problem.

86.     It is particularly egregious that Officer Cronin not only consumed alcohol at lunch with his supervisor and other officers while in the midst of training, but that they then continued drinking excessively a few hours later after being released from training.

87.     If Cronin, his sergeant and fellow officers were released early from training that day, which as noted is known to be a common practice, then his on-duty alcohol consumption was even more extensive.

88.     Whether the post-training drinking was technically on-duty or off-duty, Sgt. Ching, and the other officers who drank with Cronin at the Alehouse post-training, implicitly

condoned and encouraged Officer Cronin to consume more than ten alcoholic beverages. They then did nothing to prevent him from operating his motor vehicle, although knowing he was drunk *and* in possession of his service weapon. In so doing, Sgt. Ching and Officer Bracconeri drinking with Cronin actively created and/or increased the danger that innocent civilians - in this case; Rob, Joe, and their families - would be victims of Cronin's resultant conduct.

89.    Defendant Cronin's alcohol fueled misconduct was not an isolated incident as evidenced by the number of other incidents, in addition to the Cronin incident, involving intoxicated NYPD officers in 2014 alone. This is evidenced by countless alcohol related arrests involving police officers over the years and a litany of violent acts by on-duty police officers misusing force, including deadly force.

90.    In addition to this incident, other incidents involving intoxicated NYPD officers, in 2014 alone, include:

a.    In January 2014, a NYPD Police Captain found ten beers in the Forty-Seventh Precinct.

b.    On March 21, 2014, NYPD Police Officer Liam Donahue, 22, slammed his car into an unoccupied car in Bayside, Queens just after 5 a.m. The rookie was charged with DWI.

c.    On April 7, 2014, NYPD Police Officer Shieed Haniff was charged with four counts related to an incident in which he allegedly crashed into multiple cars and nearly plowed down his fellow police officers while driving drunk.

d.    On April 17, 2014, Jeffrey Balzotti, 30, an NYPD Sergeant, was pulled over at 2:30 a.m. in his 2007 Honda Civic on West 126th Street and charged with driving while intoxicated and reckless driving.

e.    On April 18, 2014, at approximately 4:30 a.m., NYPD Police Officer Jose Vanderpool, 30, was charged with DWI after he got into an accident on 32nd Avenue in the Jackson Heights section of Queens and refused a breathalyzer.

f.    On April 18, 2014, at approximately 5:00 a.m., NYPD Sergeant Donald Stewart, 34, was arrested and charged with DWI after he was pulled over near Fulton Street and Boyland Street in the Bedford-Stuyvesant section of Brooklyn.

g.      On April 23, 2014, NYPD Detective Jay Poggi got drunk and accidently shot his partner in the wrist with a .38 revolver.  Instead of calling an ambulance, Poggi decided to personally drive his wounded partner to the hospital—netting him a DWI after he blew a .113 on a blood alcohol test.  Investigators believe the shooting occurred when the on-duty officers, who had just consumed 11 beers apiece, were firing the gun in the air.

h.      Just three hours after the Cronin shooting on April 29, 2014, outside a strip club in Somerset County, New Jersey, NYPD Sergeant Wanda Anthony, assigned to the 122nd Precinct in Staten Island, fired at least one round at a former boyfriend.   Anthony, who fled in a car, was intoxicated at the time of the shooting.

i.      On June 11, 2014, NYPD Police Officer Eugene Donnelly was accused of breaking into an apartment while drunk and wearing only his underwear, then attacking a woman while on her bed. A police source said Donnelly, "beat the hell out of her." The alleged attack came a day after Donnelly received an award from Mayor de Blasio for arresting a gunman.

j.      On August 12, 2014, NYPD Police Officer Richard E. Christopher, 32, with a reported blood-alcohol content of 0.21, drove the wrong way on the New York State Thruway near Suffern, crashing his car head-on into a Honda CRV driven by James DeVito of Airmont. A BAC above 0.08 is a misdemeanor. Both men were killed in the crash, which occurred just before 7 a.m. on Aug. 12, 2014.

91.     In addition to the 2014 alcohol fueled incidents cited above, there are numerous other examples of alcohol abuse by NYPD officers, and the harms that result. Examples include, but are not limited to:

a.      On October 6, 2013, drunken off-duty NYPD Police Officer Joseph McClean was arrested and charged after hitting a pedestrian in Staten Island.  The pedestrian was killed and the officer was charged with manslaughter.

b.      In August 2013, veteran NYPD Police Officer Ronald Holmes was charged with drunken driving related offenses after driving the wrong way on the Southern State Parkway, in Long island, New York.

c.      In March 2013, Joseph King, a 28-year-old NYPD Police Officer, was charged with DWI, Leaving the Scene of an Accident, and Refusal to Take Breath Test. Police say King had gotten into an accident on the BQE in Queens around 4:30 a.m. on Sunday.  After allegedly fleeing the scene and then being pulled over, he refused to take a breath test.

d.      On March 17, 2013, at 6 a.m., NYPD Police Officer Dennis Munge, 32, was charged with DWI in Jackson Heights, Queens.

e.      On March 18, 2013, at 1:30 a.m., NYPD Detective Washington Mosquera, 37, was charged with DWI in Brooklyn.

f.      On November 16, 2012, NYPD Police Officer Miguel Ocasio, 30, was pulled over and was arrested after he refused to take a breath test, authorities said. Police charged him with resisting arrest, driving while intoxicated and refusal to take a breath test.

g.      Also on November 16, 2012, NYPD Police Officer Ismile Althaibani, 29, was pulled over at about 3 a.m. and ultimately charged with driving under the influence.

h.      In July 2012, NYPD Police Officer Elvis Garcia, 27, who had been on the job for just a year, was driving his personal vehicle about 5:45 a.m. when he was involved in a two-car crash. He was subsequently charged with driving while intoxicated.

i.      In July 2012, NYPD Police Officer Salisha Alirasul, 34, was arrested for DWI.

j.      In July 2012, NYPD Police Officer Brayan Terrazas, 26, was arrested for DWI.

k.      On February 27, 2012, NYPD Police Officer Christopher Morris, 31, was driving a marked squad car when he lost control and smacked into a light pole in East New York about 4 a.m. He was charged with driving while intoxicated.

l.      In December 2011, NYPD Police Officer Rafael Casiano, 44, was driving on a Bronx expressway at about 4:30 a.m. Friday when his car smashed into a center divider. The passenger was another off-duty NYPD Police Officer, Keith Paul, who suffered a head wound and had to be hospitalized. They were coming home from their Manhattan precinct Christmas Party.

m.      In December 2011, NYPD Police Officer Kleaburgh Carvajal was charged with DWI.

n.      In March 2011, NYPD Police Officer Sergio Gonzalez drove under the influence of alcohol or drugs and crashed into the rear of an NYPD patrol car before finally being handcuffed.

o.      In October 2009, NYPD Detective Kevin Spellman was sentenced to three to nine years in prison for the drunk-driving death of a Bronx grandmother.

p.      In 2009, off-duty NYPD Police Officer Andrew Kelly struck a girl with his car in Brooklyn.  Kelly pleaded guilty to driving drunk, served 90 days in jail and went to rehabilitation.

q.      In 2001, an off-duty NYPD police officer who spent up to 12 hours drinking before going to his Brooklyn precinct struck and killed a 24-year-old pregnant woman, her 4-year-old son, and her 16-year-old sister.  Medical staff delivered the woman's baby boy, who died 13 hours later, and NYPD Police Officer Joseph Gray was eventually convicted of four counts of second degree manslaughter.  He was sentenced to 5 to 15 years in prison.  The event "mushroomed into scandal" when it was discovered that other officers were drinking with Gray in a topless bar at a nearby precinct parking lot before the incident.

r.      On May 18-20, 1995, NYPD police officers, staying at the Hyatt Regency Hotel in Washington, D.C., disrobed, poured beer down the lobby escalator and then slid down it.  Some sprayed fire extinguishers at each other and at other guests, set off false alarms and vandalized the hotel.  Other reports involve armed officers in uniform drinking heavily and firearms being discharged from a hotel.  Officers also allegedly tried to gain entry to women's rooms by posing as Federal agents and harassed female guests.

92.      Defendant New York City, as a matter of policy and practice has, with deliberate indifference failed to adequately discipline, train or otherwise direct police officers, including the Defendant Officers Braconerri, Concannon and Griffin, with regard to the consumption of alcohol off and on-duty and employ adequate policies and procedures that address NYPD employee alcohol consumption and use of force, thereby causing the Defendant Officer Cronin to engage in the unlawful conduct described above.

93.      Defendant New York City, as a matter of policy and practice, has with deliberate indifference failed to properly investigate the background, beliefs and attitudes of prospective police officers in order to ensure it hires only police officers that respect and honor the constitutional rights of individuals, thereby causing police, including the Defendants in this case, to engage in the unlawful conduct described above.

94.      Defendant Alehouse had violated the New York Dram Shop Act, N.Y. Gen.

Oblig. Law §11-101, and The Alcoholic Beverage Control Law §65(2), by serving, unlawfully selling, and assisting in procuring liquor to visibly intoxicated persons, Officer Cronin, Sgt. Ching, and Officer Bracconeri thereby causing or contributing to their consequent intoxication and their engagement in subsequent actions that caused devastating physical and psychological injuries to the Plaintiffs.

### The Continuing Injuries Suffered By Plaintiffs

95.     Plaintiffs have both significant emotional and psychological injuries.

96.     Rob suffers from post-traumatic stress disorder.

97.     He continues to be haunted by flashbacks of bullets piercing his windshield, seeing the bullet holes that passed through Joe's headrest and his frantic efforts to get his friend to the hospital before he bled to death in the seat next to him.

98.     Every time Rob puts on his car windshield wipers, in his minds eye he sees the bullet holes.

99.     He has nights where he cannot sleep because with sleep comes nightmares where he relives the sights and sounds of Officer Cronin's attack.

100.    He continues to see a therapist to recover from the psychological and emotional injuries and to help him deal with ongoing anxiety.

101.    Such negative emotional and psychological outcomes include diagnosed post-traumatic stress disorder with a guarded outlook towards full recovery.

102.    Plaintiff Margaret Borrelli will never forget the telephone call from her husband frantically seeking phone numbers for Joe's wife and brother.

103.    Margaret next heard from Rob after he was taken to the New Rochelle Police Department for questioning.

104.    She rushed there to see him but was not allowed to speak with him while he was being questioned and only learned Rob had been taken from the New Rochelle Police Department to the Pelham Police Department for further questioning after he called her from Pelham to tell her he had been moved.

105.    Margaret went home where she waited several hours for her husband.

106.    When Rob got home later that morning he was in shock, shaking and scared.

107.    He expressed worry about his friend, Joe, whom Rob did not know at that point whether he was dead or alive.

108.    Margaret's relationship with her husband has been profoundly affected.

109.    She is unable to sleep unless he is in bed with her.

110.    When he comes home late, she stays up to wait for him to come home.

111.    Even when he is at work, she has periods of severe anxiety about his welfare -- resulting in her texting and calling him continuously throughout the day.

## FEDERAL CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

*(42 U.S.C. Section 1983 for Violations of the Fourth and Fourteenth Amendments)*

112.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

113.    At the time of the incident complained herein, Defendants Officer Cronin, Sgt. Ching, Officers Bracconeri, Concannon and Griffin, Lt. Brown and Sgt. Simonetti were all employees of the Defendant the City of New York.

114.    The acts, omissions and conduct of the Defendants Officers Cronin, Sgt. Ching, Officers Bracconeri, Concannon and Griffin, Lt. Brown and Sgt. Simonetti while members of the

New York City Police Department, and acting under color of state law, deprived Plaintiffs of their rights, privileges and immunities under the laws and Constitution of the United States; in particular to be free from physical and mental abuse, excessive force, malicious conduct, unreasonable seizures, and to due process of law.

115. By these acts, omissions and conduct, these individual Defendants have deprived Plaintiffs of rights secured by the Fourth and Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. §1983, for which the Defendants are individually liable.

## SECOND CLAIM FOR RELIEF

*(Monell Claims for Municipal Liability Against Defendant New York City)*

116. Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

117. The acts, omissions and conduct of Defendant New York City, as set forth above, deprived Plaintiffs of their rights, privileges, and immunities under the laws and Constitution of the United States; in particular the rights to be secure in his person and property, to be free from physical and mental abuse, excessive force, unreasonable seizures, malicious conduct.

118. By these acts, omissions and conduct, Defendant New York City has deprived Plaintiffs of rights secured by the Fourth and Fourteenth Amendment to the United States Constitution, in violation of 42 U.S.C. Section 1983.

## THIRD CLAIM FOR RELIEF

*(Supervisory Liability)*

119. Plaintiffs incorporate the allegations contained in the previous paragraphs of the Complaint as if fully set forth herein.

120. Sgt. Ching, at all relevant times Defendant Officer Cronin's and Defendants

Officers Bracconeri, Concannon and Griffin's supervisor, directly and personally participated in acts that were the proximate cause of Plaintiffs' injuries.

121.    Defendant Sgt. Ching knowingly, and with a grossly negligent derogation of his duty, encouraged and facilitated Officer Cronin and other officers under his supervision to drink excessively while both on-duty and off-duty.

122.    Defendants Sgt. Ching, Lt. Brown and Sgt. Simonetti knowingly, and with a grossly negligent derogation of their duty, encouraged and facilitated Officer Cronin to drive his car while under the influence of alcohol and in possession of his service weapon and through their actions and inactions communicated that Cronin could violate the law and NYPD policies without consequences.

123.    Defendants Lt. Brown and Sgt. Simonetti, were grossly negligent in allowing Cronin, his supervisor Sgt. Ching, and Officers Concannon, Griffin and Bracconeri  to drink alcohol, both on and off-duty, while under their supervision on April 29, 2014, to operate vehicles and to resume control of their service weapons without determining their fitness for duty.

124.    As a direct and proximate cause of Defendants Sgt. Ching's, Lt. Brown's and Sgt. Simonetti's failure to supervise their subordinates, particularly Officer Cronin, Plaintiffs' constitutional rights were violated as aforementioned in violation of 42 U.S.C. Section 1983.

125.    As a direct and proximate result of the aforementioned actions and/or inactions of said Defendants, Plaintiffs' constitutional rights under the Fourth and Fourteenth Amendments were violated by said Defendants.

## STATE CLAIMS FOR RELIEF

## FOURTH CLAIM FOR RELIEF

*(Negligence Claim Against Defendants Officer Cronin, Sgt. Ching, Officers Bracconeri, Concannon, and Griffin, Lt. Brown and Sgt. Simonetti)*

126.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

127.    Defendants Officer Cronin, Sgt. Ching, Officers Bracconeri, Concannon and Griffin, Lt. Brown and Sgt. Simonetti, while acting as agents and employees for New York City, owed a duty to Plaintiffs to perform their duties without violating Plaintiff's constitutional rights.

128.    Defendants Officer Cronin, Sgt. Ching, Officers Bracconeri, Concannon and Griffin, Lt. Brown and Sgt. Simonetti, while acting as agents and employees for New York City, owed a duty to Plaintiffs to perform their duties without violating State Laws and the policies and procedures of the NYPD and, in so doing, inflicting injuries upon Plaintiffs.

129.    Defendants' use of alcohol and unlawful and unnecessary force in shooting at and almost killing Rob, and rendering psychological injuries to both of the Plaintiffs, constitutes negligence for which these Defendants are individually liable.

## FIFTH CLAIM FOR RELIEF

*(Negligence Claim Against the City of New York)*

130.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

131.    Defendant New York City owed a duty to Plaintiffs to adequately screen prospective police officers regarding their abuse of, or propensity for abuse of alcohol, and to train, supervise and otherwise control its police officers to prevent the abuse of alcohol and their powers incidental to their employment.

132.     Defendant New York City failed to provide adequate screening, training, supervision, and control of the individual Defendants. That failure constitutes negligence for which Defendants are individually liable.

## SIXTH CLAIM FOR RELIEF

*(For Assault Against Defendant Officer Cronin)*

133.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

134.     The actions of Defendant Cronin were intentional, malicious, and were committed with wanton disregard for the Plaintiff's rights.

135.     The actions of said Defendant were unreasonable, unwarranted and constituted an excessive use of force.

136.     The actions aforesaid constituted unlawful assaults upon Rob.

137.     As a result of said conduct of said Defendants, Rob sustained serious and severe physiological injuries.

## SEVENTH CLAIM FOR RELIEF

*(Respondeat Superior Liability Against Defendant New York City)*

138.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

139.     At all times pertinent hereto, Defendants Officer Cronin, Sgt. Ching, Officers Bracconeri, Concannon and Griffin, Lt. Brown and Sgt. Simonetti were acting within the scope of their employment as officers of the New York City Police Department.

140.     Defendant New York City, through its agents, expressly authorized the individual Defendants Officer Cronin, Sgt. Ching, Officers Bracconeri, Concannon and Griffin, Lt. Brown

and Sgt. Simonetti to violate Plaintiff's constitutional rights, as described above; knew, through its agents, that its police officers had the propensity for committing such wrongful and illegal acts while both on-duty and off-duty and acquiesced in the Defendants' wrongful conduct.

141.    Defendant New York City is thus liable under the doctrine of *respondeat superior* for the intentional and negligent torts of Defendants Officer Cronin, Sgt. Ching, Officers Bracconeri, Concannon and Griffin, Lt. Brown and Sgt. Simonetti committed within the scope of their employment.

## EIGHTH CLAIM FOR RELIEF

### (*Loss of Consortium and Services for Margaret Borrelli*)

142.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

143.    At the time of the incident complained of, Plaintiffs Robert and Margaret Borrelli were married and continue to be married.

144.    As a result of the wrongful acts of the Defendants, the Plaintiff Margaret Borrelli were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, affection, assistance, and conjugal fellowship, all to the detriment of their marital relationship.

145.    All the aforesaid injuries and damages were caused solely and proximately by the wrongful acts of the Defendants.

## NINTH CLAIM FOR RELIEF

### (*Against Alehouse for Violation of the New York Dram Shop Act and The Alcoholic Beverage Control Law §65(2)*)

146.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

147.    The Defendant Alehouse City Island had violated the New York Dram Shop Act, N.Y. Gob Law §11-101, and The Alcoholic Beverage Control Law §65(2), by serving, unlawfully selling, and assisting in procuring liquor to visibly intoxicated persons Officer Cronin, Sgt. Ching, and Officer Bracconeri.

148.    Said violation caused or contributed to the consequent intoxication of Defendants Officer Cronin, Sgt. Ching, and Officer Bracconeri and their engagement in subsequent actions that caused devastating psychological injuries to the Plaintiffs.

## TENTH CLAIM FOR RELIEF

(*Against Alehouse for Negligence*)

149.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

150.    Defendant Alehouse, through its actions in serving Defendants Officer Cronin, Sgt. Ching, and Officers Bracconeri, Concannon and Griffin negligently conducted its business.

151.    As a result, Plaintiffs suffered severe psychological and emotional trauma for which defendant Alehouse City Island is responsible.

## PUNITIVE DAMAGES

152.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

153.    The acts of the individual Defendants were willful, wanton, malicious and oppressive and were motivated solely by a desire to harm Plaintiffs without regard for their well-being and were based on a lack of concern and ill-will towards Rob.  Such acts therefore warrant an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

    a. Compensatory damages in an amount to be determined at trial;

    b. Punitive damages in the amount to be determined at trial;

    c. An award of the costs and expenses of this action including attorneys' fees to the Plaintiff pursuant to 43 U.S.C. §1988; and

    d. Any such other and further relief as this Court may deem appropriate.

## A JURY TRIAL IS DEMANDED

DATED:    New York, New York
                 July 15, 2016

                                 NEWMAN FERRARA LLP

                                 By: _____
                                   Debra S. Cohen
                                   dcohen@nfllp.com
                                   Randolph M. McLaughlin
                                   rmclaughlin@nfllp.com
                                   1250 Broadway, 27th Floor
                                   New York, New York 10001
                                   Tel: 212-619-5400
                                   Fax: 212-619-3090

                                   STOLZENBERG CORTELLI LLP
                                   Howard B. Stolzenberg, Esq.
                                   hstolzenberg@stolzcortlaw.com
                                   Terrence J. Cortelli, Esq.
                                   tcortelli@stolzcortlaw.com
                                   305 Old Tarrytown Road
                                   White Plains, NY 10603
                                   Tel: 914-361-4888